# MINNEAPOLIS ASSOCIATION *v.* CANFIELD.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

Argued March 30, 31, 1887. — Decided April 18, 1887.

In November, 1872, K. was the owner of all the capital stock and in possession of all the real estate (using it as his own) of an agricultural association, incorporated under the laws of Minnesota. Two hundred shares of this stock he had purchased from G., giving notes therefor, secured

by pledge of the stock, which notes and stock were transferred to a state bank by G. to secure payment of a loan to himself. One hundred shares of the stock were purchased by K. of M., who in like manner trans-ferred them to the state bank as collateral. K. transferred the remaining shares to B. as collateral for his obligation to B., with authority also to hold them as additional security for K.'s note, held by the bank. In August, 1873, K. contracted in writing to sell a large part of the real estate to C, the purchase money to be paid in railroad bonds, and ver-bally agreed to transfer all the capital stock, and procure a deed of the real estate from the corporation. C. had no knowledge of the transac-tion with the bank and with B. It was then agreed between K., B., and the bank, that the bank should take part of the railroad bonds in ex-change for the stock held by it, the stock to be sent to the Park Bank in New York for exchange, and K. gave an order on C. for the bonds. In pursuance of the agreement K. procured a deed of the real estate to be executed by individual directors in the name of the corporation, which deed was never authorized by the directors at a meeting of the board, and delivered it to B. together with a warranty deed thereof in his own name. The order for the bonds was never presented to C., nor were the bonds deposited at the bank in New York, nor was the stock delivered to C.; but K. retained the bonds and C.'s notes for his own use. C. took possession of the real estate and conveyed a part of it to a harvester company. The association and the state bank filed a bill in a state court in Minnesota against C., to have the respective rights of the parties in the property determined. The Supreme Court of that state held on appeal that the deed to C conveyed no title to him; but that, subject to the rights of the bank and of B., C. was the equitable holder of the stock. Proceedings then took place at the motion of the state bank, which resulted in a pretended sale of the stock to various parties, whereupon C., who had filed his bill in the Circuit Court of the United States against the agricultural association and the state bank, filed a supplemental bill, including the purchasers of the stock, the general purpose of both bills being to establish his equities in the capital stock and corporate property of the association. *Held* (1), That it was not now open to him to set up that the deed of the directors was valid as the deed of the corporation, and that he acquired title through it and through K.'s deed, those being *res judicatæ;* (2) that the equities of the state bank in the stock were superior to those of C.; (3) that the pretended sale of the stock by the bank was not a real transaction; (4) that subject to some modifications the decree below should be affirmed.

In equity. The case is stated in the opinion of the court.

*Mr. Eugene M. Wilson* for appellants.

*Mr. George F. Edmunds* and *Mr. Charles E. Flandrau* (*Mr. E. C. Palmer* was also on the brief) for appellee.

Mr. Justice Matthews delivered the opinion of the court.

The original bill in this case was filed August 14, 1877, by Thomas H. Canfield, a citizen of the state of Vermont, against the Minneapolis, Agricultural and Mechanical Association, a corporation created under the laws of the state of Minnesota, and the State National Bank of Minneapolis, a corporation organized under the laws of the United States, at Minneapolis, in the state of Minnesota. Its general purpose was to establish the equities of the complainant in the capital stock and corporate property of the Minneapolis Agricultural and Mechanical Association as against the claims of the State National Bank.

Prior to the filing of this bill, in October, 1873, an equitable action was commenced by the State National Bank and Rufus J. Baldwin, its cashier, in the District Court of the Fourth Judicial District for the county of Hennepin and state of Minnesota, against Canfield, involving, to a certain extent, the matters here in controversy. The proceedings and judgment in that case are relied upon as *res judicata* in the present litigation, and are conclusive so far as the same matters are drawn in question in both suits.

The facts found by the District Court in Minnesota, in the proceeding referred to, are substantially as follows:

That the Minneapolis Agricultural and Mechanical Association in 1871 became a body corporate under the general laws of the state of Minnesota, for the purpose of promoting the agricultural and mechanical arts by holding fairs and other public exhibitions, with a capital stock of $40,000, divided into 800 shares of $50 each, all of which was paid up, and for which certificates were issued; that the government of said association was vested in a board of directors of eleven persons, to be elected annually by the stockholders, and continue in office for one year, and until their successors were elected and qualified; that said corporation became the owner in fee of certain described lands in the county of Hennepin, containing seventy acres, known as the Fair Grounds, on which it erected buildings and structures for the purpose of

accommodating the fairs which it proposed to hold, and for the other uses and purposes contemplated by their erection.

That on the 12th day of November, 1872, William S. King had become the owner of all the capital stock of the association, and was in possession of its real estate, using the same as his own individual property, without interference on the part of the corporation or its officers, the ordinary and lawful business of the corporation having been wholly suspended and abandoned; that 200 shares of the stock King had purchased from George A. Brackett on credit, giving his notes for the purchase money, secured by a pledge of the stock itself, which notes and stock, thus pledged, Brackett, on April 8, 1873, transferred and delivered to the State National Bank of Minneapolis to secure the payment of a loan of $10,000 made by the bank to Brackett; that 100 shares of said stock King had purchased from one Richard J. Mendenhall on credit, giving his promissory notes for the payment of the purchase money, secured by a pledge of the stock, which notes Mendenhall procured to be discounted for his benefit by the State National Bank, transferring to the bank the stock so pledged as collateral security.

That on July 19, 1873, King delivered to Rufus J. Baldwin the remaining 500 shares of stock as collateral security for his obligation to return to Baldwin certain gas stock of the value of $10,000 borrowed by King from him, and authorized Baldwin also to hold the said stock as additional security for King's notes held by the bank.

That on August 14, 1873, King agreed in writing to sell to Thomas H. Canfield, the complainant, the property known as the "Fair Grounds," in Minneapolis, excepting five acres subscribed to the stock of the Minneapolis Harvester Company, for the sum of $65,000, payable in 7-30 gold bonds of the Northern Pacific Railroad Company at the rate of ninety cents on the dollar, and the remainder in notes of Canfield, payable in equal instalments of one, two, and three years from date, with interest at the rate of ten per cent. per annum, King agreeing to procure abstracts of title, complete and perfect the same, and execute a warranty deed at as early

a day as possible; and it was then and there verbally agreed between King and Canfield that King would transfer all the capital stock of the Minneapolis Agricultural and Mechanical Association to Canfield, and also procure a deed of said property from said corporation to Canfield; that Canfield at the time of executing said agreement knew that the legal title to the property was in the corporation, but had no knowledge that the State National Bank of Minneapolis, or Baldwin, or any one else except King, had any interest in or claim to its capital stock.

That King informed Baldwin of his agreement to sell the fair grounds property to Canfield, and its terms, and it was thereupon agreed between King and Baldwin, acting for himself and the bank, that the bank should take $36,000 par value of said Northern Pacific Railroad bonds to be paid to King by Canfield in exchange for the 800 shares of stock of the Minneapolis Agricultural and Mechanical Association held by the bank, the said stock to be sent to the National Park Bank in the city of New York, to be delivered to Canfield upon his delivering at said bank to the order of Baldwin the Northern Pacific Railroad bonds to the amount of $36,000 par value, in exchange therefor.

That in pursuance of said agreement, King executed and delivered to Baldwin an order in writing on Canfield for the delivery of said bonds, which was indorsed by Baldwin, directing the delivery to the National Park Bank, and, on August 22, 1873, Baldwin sent the certificates for 800 shares of the stock, together with these orders, to the National Park Bank, with instructions to deliver the stock to Canfield on receipt of the bonds in exchange therefor.

That after the execution of the agreement of August 14, 1873, between King and Canfield, King, in pursuance thereof and for the purpose of carrying out the same, caused a deed to be executed, in the name of the Minneapolis Agricultural and Mechanical Association, for the fair grounds property, by R. J. Mendenhall, Thomas Lowry, W. D. Washburn, C. G. Goodrich, George F. Stevens, William S. King, Levi Butler, W. W. Eastman, W. F. Westfall, Dorilus Morrison, and

George A. Brackett, who were all the directors of said association, but the execution of this deed was never authorized at or by any meeting of said directors, nor was any resolution ever passed by the said board of directors in reference to the execution of the same, or authorizing the seal of the corporation to be attached thereto, or authorizing the sale or conveyance of said property in any way to said Canfield, the said deed having been executed by said parties separately and at different places, wherever said parties happened to be, at the request of said King or his attorney, for the purpose of enabling King to convey the property to Canfield. It was executed by Stevens at Utica, in the state of New York, by Morrison and Brackett in the city of New York, and by the other signers thereof in Hennepin County, Minnesota.

That said Brackett and said Morrison, at the time of signing said deed, having objected thereto on the ground that the stock was held by the State National Bank of Minneapolis, were informed of the agreement between King and Baldwin, whereby the said stock was to be delivered in exchange for Northern Pacific Railroad bonds, and thereupon executed the said deed.

That, at the time of the execution thereof by Brackett and Morrison, Canfield was informed by King that the stock of the association had been left as collateral to secure certain notes at the State National Bank of Minneapolis, and had been sent to the National Park Bank to be taken up by King with Northern Pacific Railroad bonds to be received by him from Canfield under said agreement.

That on September 12, 1873, in the city of New York, King delivered to Canfield the said deed, together with a warranty deed of the same property, duly executed and acknowledged by King, conveying the property in his own name; when and where Canfield delivered to King the said $65,000 in bonds of the Northern Pacific Railroad Company, and executed and delivered to him his notes for $6500 as required by the terms of the agreement of August 14, 1873, which deeds were, on October 4, 1873, duly recorded in Hennepin County.

That the orders in writing for the delivery of the bonds to

the National Park Bank were never presented to Canfield, nor were any of the said bonds deposited at the National Park Bank, nor was the stock of the association or any part of it ever delivered to Canfield, but was held by the bank as collateral security for the payment of the notes and the return of the gas stock, as hereinbefore stated.

That King retained for his own use the railroad bonds and Canfield's notes received under the agreement of August 14, 1873, and that Canfield through inadvertency did not demand the delivery of the stock of the association from King at the time of the delivery of said deed by King to him and the transfer of the bonds and notes by him to King, he, Canfield, supposing that the deeds delivered to him conveyed a complete title to the property.

That the Minneapolis Agricultural and Mechanical Association had no corporate property except the said Fair Grounds, and that shortly after receiving said deeds from King, Canfield conveyed to the Minneapolis Harvester Works Company the five acres excepted out of the said property by the terms of the agreement of August 14, 1873, which said five acres had been, previously to the execution of said agreement, subscribed to the stock of said company; and that shortly after receiving his deeds, Canfield took possession of the grounds and of the buildings remaining thereon, and remained in possession thereof at the time of the decree in said suit.

Upon these facts it was adjudged by the District Court of Minnesota that Canfield, by virtue of the deeds referred to, acquired no title to said real estate; that the State National Bank of Minneapolis was the *bona fide* holder of the whole amount of the capital stock as collateral security for the debts due to it, and by reason thereof had a right to have the property of the corporation applied to its redemption, which right was prior and superior to any claim to or interest in said stock or real estate on the part of Canfield; but that Canfield, subject to the right and interest therein of the said bank, was the owner in equity of the said stock. Neither King nor the Minneapolis Agricultural and Mechanical Association were parties defendant in that suit, and the relief, therefore, granted

by the judgment therein was limited to declaring that the deed purporting to be executed by the corporation to Canfield was null and void as against the State National Bank of Minneapolis, and to directing that said judgment be recorded in the office of the Register of Deeds in Hennepin County, so that said deed should not thereafter be a cloud upon the title of said corporation to said real estate. This judgment was entered on March 17, 1877. An appeal was taken therefrom to the Supreme Court of Minnesota, the decision in which is reported in *Baldwin* v. *Canfield*, 26 Minn. 43.

In that case it was declared by the court that the deed purporting to be made by the association was not the act and deed of such association, and therefore did not convey the title to the premises in question to Canfield. The court further said: "The directors took no action as a board with reference to the sale of the premises, or the execution of any deed thereof. So far as in any way binding the corporation is concerned, their action in executing the deed was a nullity. They could not bind it by their separate and individual action. Hence it follows that the so-called deed is not only ineffectual as a conveyance of real property, but equally so as a contract to convey."

The court also declared as follows: "Upon the facts found and the preceding conclusions of law, the plaintiffs, as holders of the stock, are interested in the preservation of the corporate property, and in preventing it from passing out of the hands of the corporation. If this is so, they have a right to take legal means to preserve the property, to prevent it from being lost to the corporation, or its value from being impaired. If such value is practically impaired by a cloud upon the title of the corporation to real property, they have a right to have the cloud removed. Their ownership of the stock, either general or special, gives them a right to defend it, as in the case of any other property. This right is paramount to any right upon the part of King as the general owner of the stock, or of Canfield as equitable owner of it, for the reason that by the contract of pledge King has subordinated his rights to theirs, while Canfield's right to the stock accrued while the

stock was in the plaintiffs' hands — while they were holding the certificates which are the evidence of its ownership. The certificates were not delivered to Canfield. This fact bound him to take notice of the rights of the plaintiffs as holders of them in pledge."

It was also held, that, subject to the right and interest of the plaintiffs as thus defined, Canfield was in equity the owner of the whole 800 shares of said stock. This judgment was not rendered until May 5, 1879.

In the meantime, and subsequent to the rendition of the judgment in the District Court of the state, on the 10th of July, 1877, the State National Bank gave notice of an intention, on the 25th day of July, 1877, to sell at public auction the 800 shares of the capital stock of the Minneapolis Agricultural and Mechanical Association for the payment of the Brackett notes and the Mendenhall notes made by King.

Said sale having in the meantime been postponed, Canfield filed the original bill in this cause against the Minneapolis Agricultural and Mechanical Association and the State National Bank of Minneapolis, the object and prayer of which were, upon the facts alleged, to assert his equity as owner of the said 800 shares of stock and in the real estate of the Minneapolis Agricultural and Mechanical Association, and in the meantime to enjoin the intended sale of said stock, which had been adjourned to August 15, 1877. On September 13, 1877, an application for an injunction to restrain the said sale, having been previously made and submitted, was denied; and on September 15, 1877, the said sale, originally advertised for July 25, 1877, adjourned to August 15, 1877, and again adjourned to September 15, 1877, took place, and the 800 shares of capital stock of the Minneapolis Agricultural and Mechanical Association were struck off and sold to one J. M. Knight for the sum of $13,000, that being the highest bid for the same. This sum was the estimated amount due to the bank for which it held the stock as collateral; the gas stock, or an equivalent, having in the meantime been returned. At the time of the sale, the State National Bank executed to Knight a guaranty of the title to the stock sold.

On December 31, 1877, Knight sold to Dorilus Morrison 720 shares òf his stock in consideration of $12,430.42, Morrison assuming and agrèeing "to pay the costs, expenses, and charges incurred and to be incurred in or about certain legal proceedings instituted in respect to the said shares of stock, and in respect to the real estate of said association, in which the State National Bank of Minneapolis and R. J. Baldwin were parties." On February 23, 1878, the Minneapolis Agricultural and Mechanical Association, by its board of directors and officers, executed a deed in fee simple of the seventy acres of land cqnstituting the Fair Ground property to Dorilus Morrison and James M. Knight, nine-tenths thereof to the former and one-tenth to the latter. This deed was executed by the authority of the board of directors elected by Morrison and Knight, as sole stockholders, for that purpose. On October 22, 1878, Morrison conveyed by deed in fee simple to Jacob K. Sidle and Robert B. Langdon his undivided nine-tenths of the said Fair Ground property ; Morrison also conveyed to Sidle and Langdon his 720 shares of the capital stock of the Minneapolis Agricultural and Mechanical Association and the guaranty of title to the same by the State National Bank of Minneapolis. The deed to Sidle and Langdon on its face is absolute, but the title was held by them in fact in trust for certain persons, as expressed in written declarations of trust given to each of the *cestuis que trustent.* The following is a copy of one of these declarations:

"MINNEAPOLIS, October 22, 1878.

"Whereas divers persons have advanced to us, J. K. Sidle and R. B. Langdon, sums of money amounting to twenty-nine thousand six hundred and sixty-eight and $\frac{73}{100}$ dollars, wherewith we are to pay off and liquidate the indebtedness of the Northwestern Mechanical and Agricultural Association as to particular matters, and also to pay off certain incumbrances heretofore resting upon an undivided nine-tenths of the fair grounds in the City of Minneapolis, of which sum W. D. Washburn, of said city, has advanced twenty-five hundred dollars; and whereas we have at this date received from

Dorilus Morrison and wife a deed of the same undivided nine-tenths of the said fair grounds, the title to which is, however, in litigation; we therefore agree that, in case the result of the said litigation shall be to validate our title, we shall, as soon as may be reasonable after one year from the date hereof, sell said land, and from the proceeds of such sale pay the said advances to the persons severally making the same, with interest at the rate of ten per cent. per annum, if the sum realized from such sale shall be sufficient to cover such payment. But if the proceeds of such sale shall not be sufficient to pay such advances and interest in full, then we agree to pay and apply such proceeds in payment of such advances *pro rata* to each person in proportion to the amount of the advance by him made. This is the extent of our obligation in the matter, and if our title to the said land shall fail, then no duty or obligation rests upon us."

The circumstances in which the conveyance to Sidle and Langdon was made are shown in the proof and stated by counsel for the appellants in his brief, as follows:

"In the year 1878 a fair was held in Minneapolis, upon the same land, under the auspices of another organization, known as the Minnesota Agricultural and Mechanical Association. At the same time a rival fair was held at St. Paul. Minneapolis, at a large expense, secured the presence of the most famous racing horses and finest blooded bulls. St. Paul secured the attendance of the President of the United States and staff. The competition was great and costly. As is not unusual, the expenditures exceeded the receipts. The Minneapolis deficiency was fourteen thousand dollars over and above all receipts and large amounts of private contributions. This was due for labor and material for buildings on the grounds, services in and about the fair, premiums, advertising, railroad freights, and such other like matters, as would occasion the greatest amount of complaint and public reproach if not paid. It was claimed that Morrison was, as the owner of the land, liable for the material and labor bestowed thereon, and liens were threatened to be filed on the same. Meetings were held by the leading citizens, and it was at last agreed that an

amount of some $30,000 would be contributed, providing Morrison would convey his nine-tenths interest in the land and stock to appellants Sidle and Langdon, in trust for the contributors, in consideration of his being paid the money it had cost him. and interest, and of having the taxes paid on said land, and of being relieved from the claims against him on account of labor and material so furnished. The amount of purchase money and interest then amounted to some $14,000; taxes due to over $2000; and the said material an labor for which it was claimed Morrison and the land were liable to some $6000 more, — in all some $22,000. It was also agreed that the trustees should bear all expense of defending the title against any litigation involving it. According to such agreement, Morrison conveyed the said nine-tenths of said land and stock to said Sidle and Langdon, and they executed a written acknowledgment of the trust to each of the contributors. This paper stated the amount of each contribution, and the obligation to sell the land as soon as the title should be cleared from litigation, and pay the amount of advance and ten per cent. interest, if proceeds were sufficient, and if not to pay *pro rata*. No provision was made as to distribution in case of a surplus. Such was either not contemplated, or forgotten, or, as is very probable, it was hoped that some means might be developed to secure the land for a public fair ground for the city.

"Dorilus Morrison was one of the contributors to this general fund to the amount of $3000. There were also contributions made by Farnham and Lovejoy, and three railroad companies, aggregating some $6500, which were met by claims against Morrison and the 'Fair Association.' The remainder was contributed by citizens having no interest in the matter, except the reputation of the city, and among others appellant Langdon contributed $7000 and appellant Sidle $2500."

On August 14, 1880, the complainant, on leave, filed his supplemental and amended bill in this case, to which he made as additional parties defendant Knight, Morrison, Baldwin, King, Sidle, Langdon, William D. Washburn, S. W. Farnham.

James A. Lovejoy, and George A. Brackett, all citizens of Minnesota. This amended and supplemental bill, in substance, after reciting the original bill, charged that at the time of the pretended sale of the 800 shares of the capital stock of the State National Bank to Knight, the bank had no rightful lien thereon by way of pledge for any unpaid debt, having in fact released the same by its agreement with King to accept from him $36,000 of the Northern Pacific Railroad bonds in satisfaction thereof. It further charges that the said pretended sale to Knight was no sale at all, but was merely a contrivance for the purpose of converting the title of the bank as pledgee into an absolute title, in fraud of the complainant, and that consequently Knight, by virtue of said sale, acquired no better title than that previously held by the bank. It is further claimed that Morrison as assignee of nine-tenths of the said stock, and Sidle and Langdon as his assignees, purchased with full notice of all the equities of the complainant, and therefore are not purchasers in good faith. The amended and supplemental bill, therefore, seeks to charge Sidle, Langdon, and Knight as holders of the legal title to the stock and the property represented by it in trust for the benefit of the complainant, and prays for an account and a conveyance.

The cause was heard upon bill, answers, replication, exhibits, and testimony, and a final decree was rendered in favor of the complainant, establishing his equity as the owner of the stock and corporate property of the Minneapolis Agricultural and Mechanical Association, subject to the payment to James M. Knight of the sum of $569.58, and to the payment to Jacob K. Sidle and Robert B. Langdon of the sum of $8646.55. From that decree this appeal is prosecuted by the defendants below.

It was argued at the bar that Canfield acquired a complete equitable title to the real estate of the Minneapolis Agricultural and Mechanical Association by virtue of the sale thereof to him by King by the contract in writing of August 14, 1873, and by the deed in pursuance thereof, purporting to be made by the corporation, dated August 15, 1873. The ground of

this contention is, that in that negotiation and transaction King rightly represented the corporation as its agent, and that the deed, if defective to convey the legal title, because not formally authorized by the directors at a meeting of the board, was such as equity would correct and reform so as to carry into effect the intention of the parties.

This view of the question, however, is not now open; the effect of that conveyance, both at law and in equity, having been finally adjudged between Canfield and the State National Bank by the Supreme Court of Minnesota. That judgment, as between those parties and those in privity with them, conclusively establishes, for the purposes of this case, that the deed was void at law, and that the equity of the State National Bank to the stock, and in the land as a pledge for the payment of the debt for which the stock had been hypothecated, was superior to that of Canfield. We must assume, therefore, at the outset of our present inquiry, that at the date of the alleged sale of the stock to Knight, Canfield's equity consisted merely in a right to redeem the pledge, unless it had been previously released by the bank. This, upon the evidence, we find not to be the case. The agreement between the bank and King, claimed to have that effect, cannot operate as such. It was an agreement merely on the part of the bank that it would exchange the stock for the agreed amount of Northern Pacific Railroad bonds, to take effect upon mutual deliveries. King was not the agent of the bank to receive the bonds from Canfield; the title of the bank to the stock was never relinquished by it.

On the other hand, we adopt the conclusion of the court below as to the nature of the alleged sale of the stock by the bank to Knight. We are satisfied from the evidence that it was no sale at all; nothing was paid by Knight, and the stock was not delivered to him; it was not in fact a real transaction. The legal title of the stock was shifted from the bank to Knight, but Knight acquired by the transaction no other or better right than that of the bank; he still held it subject to Canfield's equitable right to redeem. Neither was Morrison, after the conveyance of nine-tenths of the stock to him by

Knight, in any better condition. He had full notice of the complainant's equity, and, as we think, of the nature of Knight's title; consequently he and Knight thereafter, each for his own proportion, held the stock, and the real estate of which they had procured a conveyance from the association, subject to the equity of Canfield. Sidle and Langdon are in the same plight; they took their title with express notice of Canfield's equity, and subject to the consequences of the pending litigation the burden and expenses of which they agreed to assume. They are entitled to hold the property only on the same conditions attached to it in the hands of Knight and Morrison; they succeeded only to Morrison's title. As against Canfield, the complainant below, however, his equity being the right to redeem the property as against the bank on the payment of its debt, the same burden rests upon it in favor of the present holders of the title, derived by successive assignments from the bank. The decree below, as a condition of redemption against Sidle and Langdon, required only the payment by Canfield of the sum of $8646.55, which was the amount paid in cash, on November 20, 1878, by Sidle and Langdon, to take up two of the notes given by Morrison for the payment of the purchase money from the bank, but that amount does not represent the full amount of Morrison's payment.

*The whole amount paid by Morrison for nine-tenths of the stock, the aggregate of three notes given at the purchase, was $12,430.43, and Canfield, in the exercise of his privilege of redemption, should be charged with the full amount due on that account. To the extent of the difference between that sum and the sum actually charged in the decree appealed from, the decree should be modified. In all other respects it is affirmed, the costs in this court being equally divided. The cause is accordingly remanded to the Circuit Court for further proceedings in conformity with this opinion.*